Morning, Your Honors. May it please the Court, my name is Josh Davis, Berger-Montague. And I have with me Jeff Berhold of his law office and Julie Pollack, an associate at Berger-Montague as well. So I respectfully submit that the appeal here turns on significantly different interpretations of antitrust and time law. I would further respectfully submit that innovative should prevail on appeal under established law, established time law, and antitrust doctrine, in that Biosense's opposition proposes some dramatic changes in the law. So in terms of just the underlying factors, I think are largely not in dispute, at least insofar as the following goes. Biosense offers a product in the primary market, which is Cardiac Mapping Systems, and its product is the CART-03. And it has a fairly dominant position in that market with 60% of all procedures using the CART-03 and unique functionality, the ability to combine an ultrasound image and a 3D map. And then there are two wholly derivative markets. One is for support services specifically for the CART-03, where Biosense also has a dominant market position, 95% of procedures using the CART-03 rely on Biosense's support services. And then a second aftermarket, a wholly derivative aftermarket, which is the three catheters at issue here are used only with the CART-03. And post-tie, which I'll turn to in a moment, Biosense has a dominant position there as well. Post-tie, the procedures using the CART-03 with this category of product are in the high 90% only Biosense. And so we come to the tie, which is for many years Biosense allowed hospitals to combine the CART-03, Biosense's CART-03 with Biosense's support services and third-party reprocessed catheters, including as reprocessed- What's your best interest of lock? What's your best evidence of lock-in? Is it the people who bought the CART-03 between November of 2014 and when the tying policy went officially into effect? Well, two points I would say. What in the record do you have for that? Sure, so one is that absolutely that there were large purchases before the tie came fully into effect in the spring of 2016. And so we have evidence of lock-in and that comes out of one of the sources of that is Dr. Forrester's report, which can be found in relevant part at volume 17, ER 3194, paragraphs 113 and 118 to 119. But the other point I would make is defendants have in fact, in effect admitted lock-in because one of the arguments that defendants make is even without lock-in, without that form of lock-in, the hospitals would not have switched. And they wouldn't have switched because BioSense has a dominant market position. It has power in the primary market. I don't think they've admitted that. I mean, maybe they can clarify that, but I mean, there's evidence that they, whether they would switch and whether they could switch are two different things, right? If they're not going to switch because, you know, they think it's a better product or they think that even without the, you know, free support services that it's still, you know, on the whole priced at a competitive level, like that doesn't show lock-in, does it? Right, so you need to show that, you know, they would want to switch, but for some reason they can't, right? Well, we know that because before the tie, there was a much higher percentage use of third-party reprocessed catheters. After the tie, because they needed the support services from BioSense, they switched. We have a natural experiment here. There's the efficacy of the tie and the fact that they wanted to switch but could not or wanted to stick. It wasn't even switch. They wanted to stay with the third-party reprocessed catheters. We know that because we have, as Dr. Forrester explains, when the switch is implemented, what happens is that there's a significant shift from third, cheaper, much cheaper third-party reprocessed catheters, catheters that the new catheters from BioSense cost one and a half to two times as much. That's not disputed. Right, right, right. But I guess my point is in order for that, the catheter market should be a, you know, it's a single brand aftermarket, right? And in order for that to be an appropriate market, you need to have some evidence that competition in the primary market for mapping systems isn't going to discipline the behavior of the manufacturer. And so what's the evidence of lock-in in that market? So we satisfy that in two different ways. So Epic versus Apple, the Ninth Circuit recently held, the new Cal factors weren't satisfied, but that didn't matter because plaintiffs had shown that the defendant had market power in the primary market. The new Cal factors only kick in under Eastman Kodak and under new Cal as Epic versus Epic held when a defendant lacks market power. That's the riddle of Eastman Kodak. Hey, if a defendant doesn't have market power in the primary market, why doesn't inter-brand competition solve this problem? Well, we don't have that problem here. We can win in either of two ways and we win in both. One of the ways we win is because we have evidence that in fact, BioSense has more market power in the primary market than Apple did in Epic versus Apple. They've got 60% of the market and they have unique functionality. They have the only, the Cardo 3 is the only cardiac mapping system capable of combining an ultrasound image with a 3D map. So we don't even need the new Cal factors to show lock-in. What we can show is the reason they're locked in is the market power. It has a unique product and there are high barriers to entry and it has a dominant share of that market, 60% of all the procedures. So that's the path that the court said in Epic versus Apple. That's sufficient to establish power in the aftermarket time market. We have analogous circumstances here. We also can show lock-in because many, many of the hospitals had bought Cardo 3s before the tie, before the change in policy. Now, they couldn't show that in Epic versus Apple because there was no change in policy. So we have both paths available here. But with the, I mean, as I, I mean, I was sort of trying to figure out the fraction of the hospitals that had bought before the change in policy. And I sort of, I didn't see that clearly stated in the record, but, you know, trying to calculate that from the numbers that were in the record, it looks like, you know, it seemed to be a fairly small fraction of the devices that were in play during the period that we're talking about that had been purchased from BioSense before the change in policy. Do you have a comment on that? Yeah, so first of all, BioSense admits at pages 14 and 15 of its brief and at 63 that many hospitals, in fact, bought the Cardo 3 before the tie. And then Dr. Forrester himself shows that as of 2020, many years after the tie, a majority of hospitals had bought before the tie was implemented. And that is available at, in his opening report at 17 ER 3181 paragraph 71. So if you look now, and now we're talking eight years after the tie, there's still a significant number, but they're smaller. But it was actually, as you can imagine, before the tie, the folks who own the Cardo 3 are overwhelmingly going to be ones who bought it. And then slowly that's going to degrade over time. But all of that is going to cause very significant lock-in. But again, there are two forms of lock-in here, either one by itself sufficient. In Epic versus Apple, there wasn't any change in policy, so there wasn't any lock-in beforehand. But the court said, because Apple has market power in the primary market, that's enough then to confer power in the tie market. And that's what we have here, which is, I mean, the ultimate issue we're trying to get at is, was it possible for this tie to work? And what we know is it did. I mean, BioSense admits it didn't lose sales of the Cardo 3. It acknowledges that, I could cite the page if that's helpful in this brief. And the question is only, okay, so inter-brand competition didn't work. Well, how does the fact that they didn't lose sales show that it worked? I mean, yeah, sorry, go ahead. Well, we know it worked because there's no change in quality. We have third, we have hospitals. There's no evidence, there's no argument that something changed. What we have is a very simple scenario. Hospitals are buying more and more each year third-party reprocessed catheters because they cost 30 to 50% less. The new ones are 1 1⁄2, roughly 143%, but 1 1⁄2 to two times as much. And then BioSense implements this tie and we see this dramatic shift away explained only by the tie being effective. So then the question becomes, well, why didn't inter-brand competition work? Well, we know it didn't because at the inter-brand level, at the CARTO3 level when you're committing, those sales stay steady. They don't go down. Why don't they go down? Two reasons. The most important and straightforward is BioSense has power in that market. It's got 60% share and it's got unique functionality and there's tons of evidence of the record that doctors care about that unique functionality and they have a lot of influence about what's bought. So we have the answer staring us in the face about whether there's market power. And what's the best authority for the proposition that the unique functionality, I mean, the unique functionality is relevant here? Because that, I mean... Jefferson Parish lists it as one of the bases for market power in a tying case. Unique functionality, a unique product is one of the bases that suffices to establish power in a tying market. And then the proof is in the pudding because nothing changes. BioSense is not arguing that they suddenly acquired large amounts of market share in the catheters market, in these three catheters, for any reason other than the tie. They haven't come up with an alternative causal explanation. And so we know that the tie worked in that sense. There's market power. It's the very definition of market power. I mean, in fact, what they've argued are radically different proposals. They said, hey, you haven't shown our prices increase. Sure, you may have shown that the purchasers, the hospitals, paid more for catheters as a result of this tie, but you haven't shown our prices have increased. That's the wrong issue. The question is coercion. The market power defined in this context is forcing purchasers to buy something differently than they otherwise would without the tie. And there we have evidence, plain as day, that that's what the tie did. It pushed purchasers from the reprocessed catheters to new one. And indeed, even their pro-competitive justification. I was talking to Professor Elhigg about tying generally, not that long ago, and he said, you know, if you assert preventing free riding as a pro-competitive, alleged pro-competitive justification, not only does Eastman Kodak say that's not legally cognizable, but that's an admission of market power. That doesn't work unless the tie is coercing the purchasers to change their purchasing powers that would otherwise exist. So implicitly, Biosense has admitted that it has market power in the tying market. Otherwise, it's tie wouldn't work to prevent free riding. It's tie wouldn't shift them from reprocessed catheters to new catheters. How does it work? Two sources of lock-in, market power in the primary market, which we know, we've passed the test for that. And in addition, that initially when the tie was imposed, virtually all the hospitals had bought before the tie, and then slowly over time, a smaller proportion. Is there any case law that requires a certain percentage or number of locked-in customers in order to survive summary judgment? Well, so there's two forms of lock-in. For the lock-in that in terms of power in the primary market, in the Epic versus Apple case, 52 to 57%, depending on what part of that opinion you read, a little bit of inconsistency is enough market power combined with high barriers to entry. But you're saying that's market share? That's market share and market power in the primary market. No, but I'm talking about the number of customers that were locked in, of all of your customers. Sure, I'm just saying that both of those have the same effect. They prevent customers from abandoning in the face of the tie, the product category as a whole. I don't know of any market, I don't know of any cases when you take the new CalFactors approach to lock-in that specifies. So your position is because BioSense's market share in the primary market for Carto 3s was consistently 60% before the tie, after the tie. Right, that's- That's your argument that there was no disciplining in that market based on- Which is what the new CalFactors are trying to get at. The new CalFactors are a second best approach to the primary issue. The new CalFactors are a solution to a riddle. The riddle is if you've got these wholly derivative aftermarkets, why doesn't competition in the primary market take care of any overcharges? And the easy answer, which Epic says all of this, Epic versus Apple says Eastman-Kodak doesn't apply if there's power in the primary market. We don't even have to go down that route. And here, Epic versus Apple says, we do have that power. You don't pass the new Cal test, but that's fine. There's still power in the tying market because there's power in the primary market. And this is wholly derivative of that. And so inner brand competition is not going to undermine an overcharge. And what's the evidence of power in the primary market? I mean, I take the point that they have a large market share, but what's the evidence that they have the power to raise prices above competitive levels? Well, there's a couple of things. There are high markets. So the indirect evidence would be high market share and barriers to entry because of unique functionality, which Jefferson Parish, again, says that's enough. I mean, Jefferson Parish, the standard for market power in a tying case is probable ability to raise prices. But here we know absolute ability. I mean, the thing is, this is where it's so easy to get turned around in tying cases. The question is, if you have a tie in the aftermarkets, two things, are purchasers forced? Do they in fact change their purchasing as a result of that tie? Here we know they did. We track it. Dr. Forrester has the numbers. They go from the mid 80s of BioSense's new catheters up to the high 90s. Okay, so we know that's true. And then do we see a decrease in the whole category of purchases at the primary level that could potentially drive those prices down because inner brand competition takes care of the problem. And here we don't see that. So we've got sort of the solution staring us in the face. We know that they have that power because that's what they did. The shift, they didn't lose inner brand competition at all. They maintained it. BioSense admits their sales of CAR-03 are maintained. So they don't lose anything there. And they did use the tie successfully to drive customers from a cheaper alternative that we know they preferred because they bought it before the tie was imposed to the more expensive BioSense product after the tie was imposed. This is the direct evidence. This is the best evidence we could possibly have. So there's no guesswork here. All right, well, we've taken you past your time. We'll give you two minutes for rebuttal. Thank you very much, your honors. Ms. Forrest. May it please the court. Catherine Forrest for BioSense Webster. And I have here with me Carla Claus, my colleague. What I'd like to do, your honors, is to start with a couple of things. I want to address the high market share that counsel says prevents there from being, in the systems market, that prevents there from being any kind of competitive control of the aftermarket in the fourth new Cal factor. But I also want to make sure that we don't lose sight of a couple of other points first. And then I'll go through some of his other arguments. A couple of points that I think are very important to keep in mind is that Innovative itself is perfectly capable of providing service for the BioSense Webster catheters, and they choose not to. That's in the record. It's from the testimony of the CFO, Mr. Einwechter, at ER 5592. In fact, Innovative itself also markets itself as of 2020 as providing training and support to service the BioSense Webster catheters. I would recommend that your honors take a look at ER 1780 for the 2020 reference, but also there's a variety, I won't go through all of them, 2102. Wait, did you just say they're providing support for the catheters or they're providing support for the mapping system? Support for the catheters for use with the mapping system. And they say in training materials that they're prepared to train the hospitals to do this. They're prepared, in fact, to provide their own representative to do this. So they themselves are not out of the market. There's no foreclosure of Innovative. They are actively marketing themselves as being able to provide a service. But more than that, they've already said that they could provide the service and have the capability, but choose not to do so because they sell a lower cost product, the reprocessed catheter. Can we just get a couple of facts on the table? So BioSense concedes that its catheters are more expensive, have a higher price than the reprocessed catheters, correct? Your honor, what we would concede is that the BioSense Webster has a product that's a value-add product. It's a differentiated product as competition would have competitors do. But is the price higher? Because that's my question. The price is higher because it's got not only a catheter that's brand new, but it's also got service. What Innovative has is only reprocessed with no service. So it's apples to oranges, your honor, and there has been no pricing study that's attempted to try and take a price increment and attribute that to the portion of the price of the BioSense Webster catheter. And you would concede that the BioSense catheter's price increased after the tying policy went into effect? I would not, your honor. There is actually no evidence of a price increase at all. The sole evidence of price increase is from the declaration of Dr. Forrester. Dr. Forrester, who was Innovative's expert, did several pricing studies, all of which he acknowledges, and his Exhibit 9 is one of these, all of which he acknowledges in his testimony are aggregated prices. They're prices from multiple manufacturers put together, and so you've got- Okay, then let me ask you a question. So you're conceding, although you say it's because it's a different quality product, the price of a BioSense catheter was higher than a reprocessed catheter before the tying policy, correct? Your honor, also with- Okay. Before the tying policy, the answer is yes, because it had a value-added service. So after the tying policy, was a BioSense catheter still at a higher price than a reprocessed catheter? The answer is yes, because it still contains the value-added service. BioSense Webster- That percentage higher of price did not increase after the tying policy? It did not increase, your honor, it has not changed. There's nothing in the record that said it changed, and indeed, there's nothing in the record that said that our price is a supra-competitive price. There's no competitive price that's been established in the record. For instance, every other Abbott, Boston Scientific, Philips, every other manufacturer of a mapping machine which also sells catheters also provides a similar free value-added service. There is no comparison as to whether or not their prices as compared, for instance, to reprocessed are out of whack in some way, or that ours are out of whack with theirs. So, and you would concede that after the tying policy went into effect, BioSense's share, market share in catheters increased, and Innovative's decreased. I would not concede that, your honor. What I would say is that there is, this goes to the lost sales point, that there is no lost sales. What I would say- Okay, then let me, I'm sorry, then let me ask a more precise question. You would agree that after the tying policy went into effect, BioSense's share in the catheter market increased? BioSense's share in BioSense Webster's sales of new catheters, it probably sold more units of new catheters, but that, your honor, would not tell us about the market power of BioSense Webster. If I could- Okay, I'm sorry, let me just be more precise here. I'm looking at ER 3240 and ER 3340, and from what I see, the market share, I didn't say market power, I said the market share of BioSense's catheters increased after the policy went into effect. The, your honor, I would, let me accept that as a statement, and let me- From these two exhibits, let me ask a precise question. I'm sorry if I wasn't precise earlier. From these two exhibits, it appears that innovative share of the catheter market has decreased after the policy went into effect, looking at ER 3340 and 3240. Your honor, that is also likely to be the case. I will accept that because innovative, if it chose and made a choice, a business choice, not to offer a particular service as a differentiated product, might have had an impact as a result of that. It, however- Right, but that not providing service existed before the tying policy went into effect. So that should have explained innovative's market share before the tying policy went into effect, correct? Correct. And let me, if I could, your honor, go to the 60% market share that council has focused on so much, which indicates to council that there has been a market position in the catheter, in the CARDO 3 systems area that would prevent disciplining of the aftermarket. That 60% share is drawn from a single document, your honor, which is ER 3838. That document is a Biosense Webster document which deals with a variety of products. It's from one quarter in 2020. It is not a document which looks solely at the Biosense Webster CARDO 3 procedures. It aggregates a number of electrophysiology procedures. It is certainly not a brown shoe kind of analysis that would indicate that there is a market definition from which the 60% is drawn. But even if we were to accept the 60% as some sort of number that Biosense Webster- What do you think the market share actually is then? If you- I think it's 34%, your honor. And I think it's 34% based upon the record evidence from the third party that put together during the discovery period, all of the installed base of machines all over the place, tab 279 in your honor's record. And that third party- Do you have a ER site? I do have an ER site for it, your honor. Thank you. Which is 5706 to 5707. What that third party study did was it looked at all of the installed base of CARDO 3 machines along with every other cardiac mapping machine and it analyzed which hospitals had them and which hospitals did not. And what's the time period of ER 5706 to 7? That is the current installed base. So does that mean 2023? No, your honor, the record closed here. I can't remember if it was done just before COVID. So it would have been a closed in 2020. So that is the market share as of 2020? As of 2020, your honor, I think. Okay, but I guess the time period, correct me if I'm wrong. I'm understanding that the relevant time period is November, 2014 through April, 2016 when the policy took effect. And then, I guess they're going, their numbers go through what 2021 or something like that. So in that timeframe, I'm kind of more interested than in a slice in time of 2020. So what would that number be? Perhaps 2014 through April, 2016, and then thereafter, but closer in time. Right, your honor, there were over 600 machines that were sold between the period of 2014 and 2021. Of those, 467 machines were sold after the policy was conceded to be well-known in 2016. That leaves 142 machines. There's no evidence in the record that any of the 142 machines believe that they were locked in. There's no evidence that the 142 machines were not accompanied in the medical facility with other machines that were alternative to machines to which the hospital could switch. But wouldn't you have, as a hospital, wouldn't you have a sunk cost? These machines are, what, $100,000 plus? You've already bought this. You've probably scheduled clients, assuming you had multiple mapping machines, and if you were to suddenly take one offline, you would no longer be able to service those clients that you probably scheduled these procedures with. So wouldn't there be some sunk cost if they were just to say, okay, I'm not going to use this anymore because the price has gone up and I don't want to do it? Your honor, there is evidence, actually, in the record of switching that has actually occurred. There's evidence in the record of actual switching, which I can give you. There was a 100% that switched away at ER 2482. What time period was that? That was in 2019, 2020. I'm sorry, can you give me that ER site one more time? Sure, of course. I want to write this down as fast as I can. ER 2482. There's also another example of switching of 95% switching away from CARDO to 75% with an alternative machine. ER 2482. And what time period is that? Same time period, your honor. But do you have anything that's closer to the switching of the policy? Your honor, what I would suggest with the switching of the policies, it's very important to bear in mind that many hospitals also self-service. So the switching of the policy did not somehow render the machines that were installed with the hospitals as inoperable. Hospitals, for instance, Stanford, the Mayo Clinic, there's evidence that they themselves self-service. The technicians are able to self-service, and they did. That's the reason why Innovative is today able to and fully is active in the market of selling BioSense Webster reprocess catheters. It's because while they don't get service from BioSense Webster, there are alternatives to service that are actually in the marketplace today. Also, there's other kinds of training that can occur. BioSense Webster agrees to train anyone who wants to be trained in its CARDO3 without cost, and there's evidence in the record for that. I have more evidence, your honor, of actual switching. In the Providence system, which is a large hospital system, ER 2482, St. Joseph's 2482. This is actually to the court's decision, but they cite, the court cites also its own. Others. But can I ask you something? Yes. Summary judgment. So it's just a question, is there a factual material dispute here? I'm not, we are not deciding who is winning this case. We're not making a decision on the merits. So why can't that be a factual dispute? They have evidence that hospitals find that it's very difficult to switch. They've spent a lot of money on this machine. They've trained their staff to use this machine. The doctors might like it. They've scheduled procedures. And then you have evidence saying, no, people are switching. Why isn't that a factual material dispute? Well, Your Honor, they don't have any evidence that hospitals. We have to draw all inferences in favor of the non-moving party on summary judgment. So I guess I'm unclear. It seems like what you presented is just right now a material factual dispute. No, Your Honor. Well, respectfully, I would disagree because the evidence is one-sided. The evidence is one-sided. We have evidence where all, the Biosense-Webster principles themselves actually concede that all of these machines, all of the machines, the Cardo 3, the Abbott, the Boston Scientific, the Medtronic, the Philips, the APN Health, the CardioNext, some of these machines entering in 2020, 2021, that these machines all do the same procedures. We have evidence from the hospitals that they can and do switch. We have evidence that there's no lock-in, that there is informational access, that there is the ability and that the customers, in fact, do do life cycle pricing, that the customers believe that they can and will and do switch. It's a one-sided record, Your Honor. I have given you record sites. That's not to create a material issue of fact. It's to tell you it's a one-sided record. I can also, Your Honor, give you sites for the fact that there are lots of ways in which these same hospitals are able to access low-cost machines and no-cost machines, which allows, again, active switching. For instance, Boston Scientific's machine you can get at ER1972 for zero. You can actually get a Cardo 3 for a 66% discount at ER1557 or at the Commercial Pathways document, ER3592. And there are other examples as well. Stoneman, who was head of Innovatives Marketing, she herself agrees that there are lots of subsidization opportunities for hospitals who do want to switch. That's ER2084. So, Your Honor, what I am suggesting is there can be no lock-in under these circumstances. We have lots of evidence of robust competition at the four-market level. We have admissions that there's competition at the four-market level. And therefore, you cannot meet the fourth factor under NUCAL. Indeed, the super-competitive pricing that is referenced so very often in Innovatives papers, that is as to the tied product, not the tying product. The tied product is the super-competitive pricing of the catheters. In a tying case, Jefferson Parish says you've got to show market power in the tying product. There is no such evidence. And so, Your Honor, you must then go to the indirect evidence, which requires definition of a market. And once we're into definition of a market, they cannot overcome the fourth NUCAL factor. Could you address, before you, I mean, you're over your time, but your friend, Mr. Davis, mentioned Jefferson Parish and said that the unique functionality of the product shows that you have market power in the systems market. What's your response to that? Your Honor, first of all, the witnesses from Innovative themselves indicated that this is merely a differentiation of product and that the unique functionality does not mean that these CART-03 machines can't all perform the same procedures. We know that that's the case because of the site that I gave you to 56ER-5606-07, where you will see that there are multiple institutions that do not have a CART-03. And they are not not performing these kinds of electrophysiology procedures. So these machines perform the same procedures. That is conceded. What we have is good, solid product differentiation. Yes, they do special things. That's what they're supposed to do. They're not supposed to be fungible products that all do the same things. And I can also give you other sites where other companies agree. ER-2046, ER-2069, ER-2100, and an undisputed fact by Innovative in the summary judgment, fact number 92, undisputed, that all machines are reasonably interchangeable for use. That, Your Honor, dispenses with the idea that the uniqueness of the product somehow makes it into a single product market. We would ask for an affirmance of the district court's decision. Thank you. Thank you, Counsel. Thank you, Your Honors. A few points. First, I do agree that this has become a jury trial, that this should be remanded so that it can go to a finder of fact. I will just address a couple of factual points, which, very briefly, one, in terms of switching costs. It is not, in fact, true that the price of the CAR-03 is the only issue. We have significant evidence that one of the most significant costs is training the doctors. They don't like to switch, and they have a lot of influence over which cardiac mapping system is used, and as a citation to that, if, again, Dr. Forster's opening report, 17 ER-3194, at paragraphs 113 and 118 to 119, in terms of the 60% market share number, we're actually sort of talking past each other. We're talking about the number of procedures that use a CAR-03. The discussion of the installed base is actually what percentage of hospitals have other machines or the CAR-03. Those are different questions. Some hospitals do a lot more procedures with a particular cardiac mapping system than others, and so this is very much the kind of issue that should be resolved by the finder of fact, not at summary judgment, but I do want to pull the lens back and just make a couple of other points. In terms of power in the tying market, let's be clear. The tying market, the evidence is, and uncontested, this was not, we put forward the evidence, this comes from Dr. Forster's report, that after the tie, BioSense offers support services in 95% of all procedures, 95% of all procedures using the CAR-03. That is a very high percentage, well above any percentage required for market power in the tying market, and the last point, though, I do want to make, and I thank you all very much for indulging me this morning, but the last point I want to make is what's challenging here is how easy and the complexities of the doctrine it is to get turned around. The ultimate question here of market power is a very simple one. It's if a tie, if BioSense imposed a tie, would that significantly shift the purchases of catheters from reprocessed to new? That is coercion. That's the thing we care about under Jefferson Parish and Cascade and Eastman Kodak, and what we know, or would interbrand competition or some other competition force BioSense to change its pricing structure or to give up on this, and we have the answer right in front of us. A Dr. Forster's report, he shows a couple of diagrams, 17 ER 3340 and 3341, and we can see as the tie is rolled out and then becomes fully implemented, we see reprocessed catheter percentages dropping significantly, and the sales of BioSense's new catheters also going up precipitously, and indeed BioSense says we did this to prevent free riding, which is just another way of saying we had the capacity to coerce the hospitals to buy a different catheter. That's the market power issue in a nutshell, and BioSense does not deny, it maintained all of its market share in the cardiac mapping system market, and yet its profits went up and the prices went up that hospitals paid, which is the relevant question, and so in some ways, while the doctrines get intricate to get there, and we believe we can more than satisfy them as we've laid out in our briefs, the ultimate question is really simple. It's like asking, you know, as Amex Supreme Court said in Amex, you can use direct evidence, as Epic versus Apple said in the tying case, you can use direct evidence, as Eastman Kodak did. If you see prices go up or coercion, you've got market power. Thank you very much, counsel. Thank you very much. Would you be able to indulge me for 10 seconds? Well, we don't normally allow a surrebuttal, so if there's, feel free to send in a letter if there's something else that you want to say. Thank both counsel for their helpful arguments this morning, and the case is submitted. I would ask that this not be re-litigated on paper, though, so. And the case is? I don't feel the need. Okay, the case is submitted. Thank you, your honors.
judges: MILLER, KOH, Molloy